CABLE ALABAMA CORPORATION,
Plaintiff,

v.

CITY OF HUNTSVILLE, ALABAMA, Jim Putnam, in his official capacity as a member of the Huntsville City Council, Jimmy Wall, in his official capacity as a member of the Huntsville City Council, Bill Kling, Jr., in his official capacity as a member of the Huntsville City Council, Richard Showers, Sr., in his official capacity as a member of the Huntsville City Council, Chuck Saunders, in his official capacity as a member of the Huntsville City Council, and Steve Hettinger, Defendants.

No. CV–91–N–0640–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

Aug. 6, 1991.

James A. Harris, Jr., Sirote and Permutt P.C., Birmingham, Ala., David Overlock Stewart, Michael K. Fee, Raymond C Ortman, Jr, Ropes & Gray, Washington, D.C.,

Roderic G. Steakley, John P. Burbach, Joe H. Ritch, Sirote and Permutt P.C., Huntsville, Ala., for plaintiff.

Clyde A Blankenship, Kerri Johnson Wilson, Huntsville City Attorney's Office, Huntsville, Ala., for defendants.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

I. Background.

On March 21, 1991 Cable Alabama Corporation (Cable Alabama) filed its complaint against the City of Huntsville, Alabama (Huntsville or the City), its mayor and the five members of its council. Cable Alabama states claims under the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779, 47 U.S.C. § 521 *et seq.* (the Cable Act) (Claims One and Two); the First and Fourteenth Amendments to the United States Constitution (Claim Three);[1] the Due Process Clause of the Fourteenth Amendment (Claim Four); the Takings Clause of the Fifth Amendment as made applicable to state officials by the Fourteenth Amendment (Claim Five); the Equal Protection Clause of the Fourteenth Amendment (Claim Six); and Alabama contract law (Claim Seven). By way of relief, the plaintiff seeks (1) a declaration that Section 14 of its franchise agreement with the defendants is void as being violative of 47 U.S.C. § 533(d), the First Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Takings Clause of the Fifth Amendment; (2) a permanent injunction to bar the defendants from enforcing the provisions of Section 14 to prevent the transfer of its franchise to Comcast, or taking any action pursuant to the terms of Section 14; (3) damages; and (4) its costs of bringing this action, including its attorneys fees. Cable Alabama has moved the

---

1. Claims against persons for alleged misuse of state power that have the alleged effect of violating federal constitutional and statutory rights are authorized by 42 U.S.C. § 1983. That section provides:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

court for partial summary judgment directed to Claims One, Three and Four. Defendants have each moved to dismiss the complaint for failure to state a claim upon which relief can be granted and for summary judgment on all the plaintiff's claims.

The motions have been briefed and orally argued to the court. The parties agree that there is no genuine dispute as to any material issue and that the matter should be resolved on the motions for summary judgment.[2] The defendants' motions to dismiss and for summary judgment will be denied in all respects. The plaintiff's motion will be granted on Claims One, Three and Four and the court will fashion appropriate declaratory and injunctive relief on those counts. The court will set a date for the trial of the demand for damages on Claims One, Three and Four and on the merits of Claims Two, Five, Six and Seven at a later time.

## II. The Undisputed Facts.

Until 1986 the City of Huntsville, Alabama, like the overwhelming majority of communities in the United States, was served by a single cable television system, Group W Cable (Group W). Because of significant public dissatisfaction with the services provided by Group W, the City invited other cable service providers to "overbuild" the Huntsville market in competition with Group W.[3] At the time of the City's invitation, Cable Alabama operated cable systems in three nearby communities: Redstone Arsenal, a military base adjacent to the City of Huntsville; the City of Madison, an incorporated community located west of Huntsville; and unincorporated areas of Madison County, Alabama.[4] Only Cable Alabama responded to Huntsville's invitation and, on March 11, 1986, the City and Cable Alabama entered into a comprehensive franchise agreement. (Declaration of William G. Jackson, Exhibit E) The City subsequently enacted the agreement as a city ordinance. Huntsville implicitly recognized that Cable Alabama's entry into the Huntsville cable television market and its continued economic viability in that market would be dependent upon its ability to attract the subscriptions of at least 30 customers for every mile of cable it built.[5]

Of critical importance to the issues in this case are certain provisions of the franchise agreement respecting restrictions on the right of Cable Alabama to sell, assign or otherwise transfer its rights under that agreement and rights granted to the City to approve or disapprove any proposed

---

**2.** In its primary brief Cable Alabama asserted that it "seeks the most expeditious means of resolving this dispute." (Plaintiff's Brief, pp. 2–3, n. 3) The defendants stated in brief, "We agree with the plaintiff that the material facts in connection with this matter are not in dispute, and that all issues are readily resolvable as a matter of law." (Defendants' Brief, p. 1) At oral argument the court specifically inquired of counsel whether there were any disputed factual issues and was told there were none. The parties have, on more than one occasion, made it clear that they want and need a swift resolution of this matter.

**3.** The word "overbuild" is used in the cable television industry to describe situations in which two or more cable systems cover and operate competitively in the same geographic area. Such "overbuilds" exist in fewer than 1% of the more than 8000 communities served by cable television in the United States.

**4.** Madison County lies on the northern border of the State of Alabama. It is bounded on the south by the Tennessee River and on the north by the State of Tennessee and is situated approximately halfway between Alabama's eastern and western borders. Huntsville, Alabama's fourth largest city, is its county seat and primary commercial district. Beginning in the decade of the 1950s the area experienced remarkable economic and population growth and is today noted for its highly technical and scientifically oriented industries. While earlier growth patterns have slowed somewhat, the area remains a vibrant and spirited community.

**5.** Appendix B to the Franchise Agreement, entitled *Construction Standards, Terms, and Schedule,* provided:

> II. CONSTRUCTION SCHEDULE
> B. *Continuance of Construction*
> The Company proposes to begin its construction in the area delineated Phase I on the enclosed map. The Company will construct all areas within Phase I that have fifty (50) homes or more per mile of plant. The Company will diligently continue its construction of the system in Phase I as long as the Company is able to maintain a return of thirty (30) actual customers per mile of cable plant.

(Jackson Declaration, Exhibit E)

sale, assignment or transfer. In pertinent part, Section 14 of the agreement provides:

### SECTION 14—RESTRICTIONS AGAINST ASSIGNMENT AND OTHER TRANSFERS

14.1 Except as provided in the financial plan referred to in Section 2.5.08 hereof and in this Section 14, including any extensions or modifications of the matters set forth therein, except for any significant modifications of the matters set forth in said financial plan, neither this Agreement, nor any rights or obligations of the Company pursuant to this Agreement or in the System shall be assigned, transferred, pledged, leased, sublet, or mortgaged in any manner, in whole or in part, to any Person, nor shall title thereto, either legal or equitable, or any right or interest therein, pass to or vest in any Person, nor shall any change in Control of the Company occur, either by act of the Company, by operation of law, or otherwise, without the prior consent of the City Council. Any such action completed without the prior consent of the City Council shall be null and void; provided that, nothing herein shall restrict the free transfer of partnership interests or stock of the Company if such transfers do not change the Control of the Company, and no consent shall be required for such transfers. In the event that the Company shall desire to transfer or assign the franchise or any of the rights, privileges, or immunities contained therein, to any existing Cable TV Franchise of the City, the City Council reserves the right to disapprove such transfer or assignment on any ground stated elsewhere in this Section 14, and also the City Council may consider the impact which said transfer would have upon the availability of a modern state of the art channel transmission capability system to subscribers generally within the City of Huntsville as well as the impact such transfer would have upon competition.

14.2 The Company shall promptly notify the Mayor of any proposed action requiring the consent of the City Council pursuant to Section 14.1 hereof, by submitting to the Mayor, with a copy to the City Attorney, a petition requesting the approval of the City Council. The petition shall fully describe the proposed action and shall be accompanied by a justification for the action and such additional supporting information as the City Council, the Mayor, or the City Attorney may require in order to review and evaluate the proposed action. Upon review of the petition, the Mayor shall submit the petition, within fifteen (15) days from receipt of the petition, to the City Council together with a recommendation for action on the petition.

14.3 The City Council shall schedule a public hearing on the petition within thirty (30) days after receipt of the petition for consent, and shall act on said petition within sixty (60) days thereafter. For the purpose of determining whether it shall grant its consent, the City Council may inquire into: (i) the qualifications of each Person involved in any action described in Section 14.1 hereof, (ii) all matters relevant to whether said Person will adhere to all applicable provisions of this Agreement, and (iii) all other relevant matters. The Company shall provide all requested assistance to the City Council in connection with any such inquiry and, as appropriate, shall secure the cooperation and assistance of all Persons involved in said action.

Upon its initial entry into the Huntsville market, Cable Alabama offered a basic service consisting of forty-one channels at a price of $8.95 per month. This compared favorably with the services and prices of its then competitor, Group W, which offered a basic package of twenty-four channels at a price of $13.50 per month. The plaintiff has represented, the defendants have not denied, and the evidence demonstrates that Cable Alabama offered a system that was technically superior to Group W's system. Cable Alabama initially signed up as many as seventy households per cable mile.

In the second half of 1986, Group W, which had no transfer restrictions in its franchise agreement with the City, sold its

Huntsville operations to Comcast Cable Television (Comcast).[6] Events following the acquisition of Group W's system by Comcast were described by the City in its comments to the FCC.

90. The immediate effect of Cable Alabama's entry into the Huntsville market was a protracted price war between Cable Alabama and Comcast Cable Television.... Initially, Cable Alabama offered a 40–channel basic package for $7.95 per month and Comcast offered a subscription price for basic services of $13.95 per month. By the end of 1986, Comcast had dropped its rate to $8.95 per month for a 33–channel basic service.

91. In 1987, although the cable television industry nationwide raised basic rates, Comcast announced new, lower prices. Basic service became available for $5.00 per month and, if one premium channel were added to the basic subscription, service became available for $7.00 per month.[43] Comcast followed up its $5.00 per month program with an "88¢ Offer" which gave subscribers one month of basic service plus one month of HBO and Cinemax for just 88 cents.

92. Cable Alabama lowered its prices in response to Comcast's pricing practices, but was unable to prevent a measurable downturn in the rate of its new subscriptions. Cable Alabama even complained to the Justice Department and the Federal Trade Commission, arguing that Comcast's below-cost pricing would force Cable Alabama to sell its assets and leave the Huntsville market and that Comcast thereafter would be able to raise its prices in Huntsville to the levels it charged elsewhere.

93. The eventual effect of Huntsville's overbuild was to render Cable Alabama and Comcast financially weak and therefore susceptible to an acquisition.

---

[43] As of June 1987, the industry average for HBO was $10.66 per month, compared with $9.57 for the Disney Channel. Vogel, *Entertainment Industry Economics* 198–201 (Columbia Univ.Press). (Jackson Declaration, Exbibit A, p. 42–43)

With the entry of Comcast into the market, Cable Alabama's initial successes were reversed. For example, in the first quarter of 1987 it built 116 miles of cable and was able to sign up only 10.8% of the homes made available by that expansion.[7]

Losses by Cable Alabama and Comcast during the five years before the filing of this action amounted to millions of dollars each. The Huntsville City Council's Committee on Transfer of Cable Television Franchise reported to the full council on February 7, 1991 that "Comcast and CableAlabama[8] reported cumulative net loss-

---

**6.** In comments to the Federal Communications Commission in March 1990, the City described Comcast as "one of the nation's largest cable companies with approximately 2.3 million subscribers." (Jackson Declaration, Exhibit A, p. 42)

**7.** Cable Alabama's construction and subscriber signings were:

| Quarter | Miles/Cable | Homes Passed | Subscribers | % Penetration |
|---------|-------------|--------------|-------------|---------------|
| 1986–2 | 90 | 7,200 | 3,528 | 49.0 |
| 1986–3 | 90 | 7,200 | 1,872 | 26.0 |
| 1986–4 | 38 | 3,040 | 1,140 | 37.5 |
| 1987–1 | 116 | 9,280 | 1,000 | 10.8 |
| 1987–2 | 77 | 6,160 | 960 | 15.6 |
| 1987–3 | 100 | 7,120 | 1,000 | 14.0 |

By the time Cable Alabama ceased construction of new cable, it had built approximately 511 miles of cable, had passed approximately 41,000 homes and had signed approximately 9400 subscribers. This was approximately 18 subscribers per cable mile. (Jackson Declaration, ¶ 3)

**8.** The plaintiff, in its pleadings and other filings, has designated itself as "Cable Alabama Corporation." In one or more of the documents pre-

es during the period of $26.1 million and $5.2 million, respectively." (Jackson Declaration, Exhibit H, p. 5)

In January 1988 William G. Jackson, president and chairman of the board of Cable America Corporation, the parent company of Cable Alabama, traveled from Phoenix, Arizona to Huntsville where he met with Huntsville City Attorney Charles Younger and discussed with him "the predatory pricing tactics being employed in Huntsville by Comcast." (Jackson Declaration, ¶ 5) Counsel for Cable Alabama provided Mr. Younger with a proposed ordinance "that would have made Comcast's conduct illegal." (Jackson Declaration, ¶ 5) The proposed ordinance was not enacted. Cable Alabama also asked the Federal Trade Commission for relief but received no help from that source.

In 1989 Bresnan Communications, Inc. (Bresnan), a Michigan-based cable television provider with 135,000 subscribers nationwide, entered into separate agreements to purchase the Huntsville cable systems of both Cable Alabama and Comcast. Because Bresnan planned to combine the two systems and thereafter to operate a single cable television system in the City, both purchase agreements were conditioned upon the complete execution of the other. On August 29, 1989 Cable Alabama petitioned the City Council to approve the sale of its system to Bresnan. (Jackson Declaration, Exhibit I) As noted earlier, the franchises under which Comcast operated contained no provisions requiring City approval for the sale of its system.

After an extended exchange of correspondence with Cable Alabama and Bresnan, Mayor Steve Hettinger made his report to the Huntsville City Council on February 21, 1990. In a twenty-one page memorandum to the council, Hettinger evaluated the proposed transfer and ultimately recommended that the sale be approved provided Bresnan satisfied certain financial concerns and agreed to the addition of some twenty-seven changes or additions to the franchise agreement. Mayor Hettinger stated:

If the competitive cable television market in the City were stable there would be little reason to recommend approval of the transfer petition between CableAlabama and Bresnan. But the instability of the two competing companies, Comcast and CableAlabama, raises legitimate doubt for the continuation of the competition and the resulting low cable rates. The effect of the failure of one of the competing companies would be to have the surviving company poised to recoup its past operating losses in a non-competitive market. Such conditions are undesirable.

In the process of evaluating the transfer petition, the Council must determine what is in the overall best interest of the City:

First, if CableAlabama and Bresnan continue to fail or refuse to render to the City the information necessary to evaluate the transfer petition, then the Council cannot be expected to act on the incomplete petition.

If the Council finds that the competitive market is unstable, and that Bresnan is a responsible operator, with a good reputation of service and comparable rates in other markets, and with a good and sufficient fiscal responsibility and assets to its credit; and if Bresnan is willing to submit to the terms and conditions set forth in this memorandum, its exhibits and representations made therein, and the terms of the Transfer Ordinance as shall be prepared and submitted following any public hearing(s) on the transfer petition, then I recommend that the transfer petition be approved.

To the contrary, if the Council cannot make the foregoing findings, or if Bresnan fails to submit to the herein stated terms or other reasonable terms hereinafter imposed, then in such event I recommend denial of the transfer petition.

pared by the defendants, the plaintiff has been designated as "CableAlabama." The court has accepted these varying designations used by the parties. Wherever used in this opinion, unless otherwise indicated, "Cable Alabama" and "CableAlabama" will refer to the plaintiff and only to the plaintiff.

(Jackson Declaration, Exhibit G, pp. 20–21)

On March 22, 1990 the council conducted a public hearing on Cable Alabama's transfer request as it was required to do under the terms of the franchise agreement. Public comments received at that hearing were overwhelmingly opposed to approval of the transfer request and, almost without exception, reflected the view that no single entity should be permitted to acquire ownership of both cable systems.[9] Comments of the mayor and members of the council suggest that they were not particularly aware of or concerned about any restrictions that the Cable Act might have placed upon the City's authority to consider Bresnan's possible ownership of other media in the community. Council President Ernest Kaufmann, without acknowledging the provisions of 47 U.S.C. § 533(c) and (d),[10] stated, "It is under this provision [Section 14 of the franchise agreement] that the Council may consider the effect that *the proposed transfer may have on competition* with regard to its effect on rates, quality of service, and other relevant matters." (Jackson Declaration, Exhibit I, p. 6) Mayor Hettinger, also without acknowledging the FCC's authority in the regulation of cable ownership based upon ownership of other media, made clear his concern that approval of the transfer request would have the effect of eliminating the competition between the two systems when he said, "If the City approves the company's, CableAlabama's, transfer approval request so that first Bresnan can acquire the franchise and assets of CableAlabama, and secondly Bresnan acquires the assets of Comcast,

it's obvious of course that there would be one operator providing cable services in the City." (Jackson Declaration, Exhibit I, p. 10) He stated that the council was authorized to inquire into "the effect the transfer might have on competition." (Jackson Declaration, Exhibit I, p. 10) The mayor urged the council members to make "competition" a significant factor in its decision-making process.

Let me mention the *key point, key element, and that is for a little bit about competition.* The Huntsville experience has been that the competitive situation that occurred with CableAlabama's entry into the City's cable market in 1986 resulted in improved service and the lowest rate for basic and pay TV services in the country. Those facts are undisputed.

The question is on competition whether the present competitive situation can survive. It's a shootout at the OK Corral, and we are in the position of having to decide if we think there will be survivors or just a survivor.

The Council is encouraged to carefully consider all the effects of the present competition on the cable service in the city and the reasonable result of the continuation of the present competitive atmosphere. (Jackson Declaration, Exhibit I, pp. 14–15) (emphasis supplied)

On April 10, 1990 the Huntsville City Council unanimously rejected Cable Alabama's transfer request. The following day, April 11, 1990, the plaintiff, in a letter to city officials, again requested relief in the form of municipal "pro-competition" legislation. Again, the City did not act on the request.

**9.** Typical of the comments at the hearing were those of Richard Gibson, a Huntsville resident, who said,

Competition in the consumer market has been commonplace in the business community for many years. Huntsville was without competition in the TV cable market until the City Council voted to allow the franchise of a new company in 1986.

\* \* \* \* \* \*

The City Council worked for some two years to get competition in the marketplace in Huntsville, and in 1986 that was achieved. I think we should keep it that way. The merger of two companies into one would tend to

cause pricing of cable TV to be increased and service become poorer.
(Jackson Declaration, Exhibit I, pp. 45–46)

**10.** Subsection (c) authorizes the Federal Communications Commission to prescribe rules governing ownership or control of cable systems by persons who own or control other "media of mass communications which serve the same community served by the cable system." Subsection (d) prohibits local franchising authorities, such as the City of Huntsville, from regulating ownership or control of cable systems based upon "ownership or control of any media of mass communications or other media interests."

In May 1990 Cable Alabama filed a civil action in this court against Comcast, advancing claims for predatory pricing under § 2 of the Sherman Antitrust Act (15 U.S.C. § 2) and §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and intentional interference with contractual relations under the common law of Alabama. (Jackson Declaration, Exhibit O) A negotiated settlement was reached and, on October 29, 1990, another judge of this court entered final judgment and directed Cable Alabama and Comcast "forthwith to pursue their Agreement and Plan of Reorganization." (Jackson Declaration, Exhibit P) The settlement agreement includes a plan of reorganization that calls for Comcast to acquire Cable Alabama's systems in Huntsville, the City of Madison, Madison County, and Redstone Arsenal. By its terms, the agreement for Comcast to acquire Cable Alabama's systems in the Huntsville area expires in September 1991. (Jackson Declaration, ¶ 6)

Because Comcast's acquisition of Cable Alabama would have changed the ownership and control of Cable Alabama, on December 10, 1990, Cable Alabama petitioned the City for its approval as required by Section 14 of the franchise agreement. (Jackson Declaration, Exhibit C) In a memorandum dated December 31, 1990, Mayor Hettinger recommended to the council that the transfer request be rejected. (Jackson Declaration, Exhibit Q) After noting that Section 14.1 of the franchise agreement permitted the council to consider "Other Relevant Factors," Mayor Hettinger suggested that competition was a relevant factor under that provision. He included a section in his memorandum entitled "Competition" in which he stated:

The Huntsville experience has been that the overbuild that occurred with CableAlabama's entry into the City's Cable market in 1986 resulted in improved service and the lowest rate for basic and pay TV services in the country. Those facts are undisputed.

The question is whether the present competitive situation can survive. The low service rates of Comcast have effectively stifled the growth of CableAlabama. Financial data of CableAlabama reflects operating losses for 1989 and 1990 to date. As noted earlier, this information is being verified by independent auditors working on the City's behalf. (It should be noted that in a previous public hearing pertaining to the transfer of the CableAlabama franchise, the company did not admit to operating losses.) The result of the present competition will apparently be the demise of one of the present cable providers, leaving the other as the sole provider for the City if the data presented is verified.

The present competition has other identifiable "costs." The costs associated with each company's competitive efforts have prevented either company from developing local origination programming; public, government or educational access programming; or the institutional cable network, all of which would be invaluable to this community and are found in other progressive communities throughout the country. These costs have also resulted in each company's growth into non-service areas being slowed, with attendant public complaints and dissatisfaction.

CableAlabama and Comcast–Huntsville assert that the merger is necessary to insure quality cable television service in Huntsville because of the following:

a. Both companies are losing significant sums of money. Information provided to the City, which is being verified by independent auditors, indicates that the two companies have lost over $25,000,000 in the last three years.

b. CableAlabama has been unable to significantly penetrate the market and thus, its financial viability is in question.

c. All citizens of Huntsville would receive improved cable service through the increase of the number of channels from 35 to 62 channels, which would provide approximately 100,000 residents with this improved channel capability, as well as improved signal quality reliability.

d. Many areas currently unserved by cable, estimated at approximately 10,-000 residents, will be offered cable because of the agreement of Comcast to build out the system where there are twenty or more homes per mile.

e. Comcast has agreed to keep the employees of CableAlabama on its payroll. Accordingly, over fifty jobs will be protected by reason of the merger, which will be lost if CableAlabama closes.

The Council is encouraged to carefully consider all the effects of the present competition on the cable service in the City, and the reasonable result of the continuation of the present competitive atmosphere. Any decision to approve or deny the transfer petition must be based on a careful decision that the result will be in the long-term best interest of the citizens of Huntsville. (Jackson Declaration, Exhibit Q, pp. 9–11)

The mayor concluded by recommending that the transfer request be disapproved unless there was "a definitive finding that the cable television market will not support the two existing cable franchises in Huntsville on a competitive basis." (Jackson Declaration, Exhibit Q, p. 13)

On January 10, 1991 the City Council conducted a public hearing on the transfer request. The council appointed a special committee to "negotiate the specific terms of the proposed transfer ordinance" and decided to reconvene in four weeks to continue the hearing.[11] The special committee submitted its initial report on February 7, 1991. (Jackson Declaration, Exhibit H) The committee stated that it had "focused" on making available a state-of-the-art cable system and on "the impact that the transfer would have on competition ... presently ... [and] in the future." (Jackson Declaration, Exhibit H, p. 2) The committee recognized the losses suffered by Cable Alabama and Comcast and stated:

The primary reason for the poor operating cash flow appears to be subscriber rates which are significantly below industry averages. Notwithstanding the current competitive environment, the overall conditions of the Huntsville market suggest that continuation of the current overbuild situation would not be financially viable in the long-term unless the companies increased subscriber rates to levels more comparable to industry averages.

\*　　\*　　\*　　\*　　\*　　\*

The Huntsville metropolitan area does not have characteristics such as high penetration or density, common in most successful overbuild situations. To the extent that the companies are required to continue operating in an overbuild situation it is likely that higher subscription rates would be required to prevent a deterioration in system performance, and provide long-term financial viability. (Jackson Declaration, Exhibit H, p. 6)

The committee concluded its report by asking for additional time to pursue contract negotiations with Comcast. The committee issued its final report on February 20, 1991, stating that a "substantial number" of disagreements had been resolved, but that some remained. (Jackson Declaration, Exhibit S)

On February 21, 1991 Councilman Saunders proposed a resolution that would have approved the transfer conditioned upon the

---

**11.** One member of the council made clear that maintaining the competitive cable television market was of primary importance. Mr. Saunders stated:

We ... do not now have ... any control or regulation over the cost, the rates. We do not have any control over the channels that are provided, either in the number of or which channels. One thing we do have control on is that *we can preserve competition* —if it is in the best interest of the city of Huntsville.

\*　\*　\*　\*　\*　\*

The thing that everybody that I have talked to in the past few weeks—and the thing that virtually everybody here tonight has alluded to in one way, shape, or form, is the concern that we end up with a, quote, monopoly, unquote, and what does it do for the rates. (Jackson Declaration, Exhibit R, pp. 94 and 97)

continuance of negotiations aimed at resolving the remaining differences with Comcast. (Jackson Declaration, Exhibit B, pp. 10–17) Two councilmen, Wall and Putnam, bitterly criticized Comcast's pricing practices and vowed to maintain the present state of competition. Councilman Wall stated:

> The introduction of competition into the Huntsville market vastly improved the service and quality of cable television in this community. The citizens of Huntsville have had an alternative, and each company has been keenly aware of that. A citizen mistreated by one company could simply move to another one. That factor alone has a greater impact on how a business can treat a customer than any amount of government regulation, in the form of consumer protection standards or in terms of a franchise agreement. That freedom to choose to do business with another company has more economic impact on the American competitive market than any other single factor. *I want that to be preserved for the citizens of Huntsville.*
>
> Cable Alabama and Comcast have come to the City and said, "Competition does not work." To the contrary, competition does work. It is evident from the quality of service both of these companies have provided, even while reporting operating losses.
>
> What has prevented the competition in Huntsville from working has been the tactics of one company to drive the other company out of business. It has been one company's use of its own "deep pockets" to prevent another company from surviving in what is supposed to be a free market. Competition has not failed in Huntsville; the competitors have simply refused to compete with one another on a fair basis.
>
> *I have seen no reason to make me believe that this Council should vote to end the competition that we have enjoyed in this community in the cable TV market.* It has been good for Huntsville. And I am satisfied that it would be good for the competing companies if they would simply recognize their own economic realities and compete fairly with one another. *I hate to turn the clock back 5 years to where we have one company again and go through some of the same problems that other communities in America are facing today.* (Jackson Declaration, Exhibit B, pp. 19–21) (emphasis supplied)

Council President Putnam stated:

> I think that with true and fair competition, both companies could have the opportunity to be survivors—if they want to be. I cannot in good faith or good conscience agree that it is in the best interest of the people of the community to do away with what another Council worked so hard to get. *I cannot, willingly or unwillingly, directly or indirectly, agree to be a party to what I see as a scheme by Comcast to reestablish a monopoly operation.* I do not see it as the business of the Council to get involved in the business operations of any company. It is not the business of the Council to bail out or assure any company of a profit. (Jackson Declaration, Exhibit B, pp. 24–25) (emphasis supplied)

Following this discussion the council voted three to two to discontinue negotiations with Comcast. On March 7, 1991 the council rejected the transfer approval request with Councilmen Wall, Putnam and Kling voting against approval. Cable Alabama filed suit two weeks later, on March 21, 1991.

### III. Discussion.

#### A. *The Defendants' Motions to Dismiss.*

Each of the defendants has filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. Rule 12(b)(6), Fed.R.Civ.P. These motions require little discussion. As it is required to do, the court views the complaint in a light most favorable to the plaintiff and treats the allegations as if they were true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See Stone Mountain Game Ranch, Inc. v. Hunt,* 746 F.2d 761, 763

(11th Cir.1984). The court's inquiry is focused on whether the allegations state a claim under Rule 8(a), Fed.R.Civ.P. *Investors Syndicate of Am., Inc. v. City of Indian Rocks Beach,* 434 F.2d 871, 879 (5th Cir.1970). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

The court has carefully examined the complaint and, as will be apparent later, finds that each count of the complaint is sufficient to withstand a motion to dismiss under Rule 12(b)(6). The motions to dismiss will be denied.

### B. *The Cable Communications Policy Act of 1984.*

The Congress enacted the Cable Act to: (1) establish a national policy with regard to cable communications; (2) encourage growth and development of cable television systems consistent with assuring that such cable systems respond appropriately to the needs and concerns of local communities; (3) establish guidelines for the regulation of cable systems by federal, state and local authorities; (4) assure that cable systems provide the widest possible range of information and services to the public; (5) establish orderly procedures for cable franchise renewal to protect cable operators against unfair denials of renewals; and (6) promote competition in the cable communications industry without imposing unnecessary regulations and undue economic burdens

on cable systems. 47 U.S.C. § 521. Resolution of the issues presented here require the court to interpret one or more provisions of the Cable Act. Of particular interest are subsections (c) and (d) of 47 U.S.C. § 533. Those subsections provide:

(c) The [Federal Communications] Commission may prescribe rules with respect to the ownership or control of cable systems by persons who own or control other media of mass communications which serve the same community served by a cable system.

(d) Any State or franchising authority may not prohibit the ownership or control of a cable system by any person because of such person's ownership or control of any media of mass communications or other media interests.

The primary positions of the parties on this issue may be summarized in the briefest of terms. The plaintiff argues that subsections (c) and (d) of section 533, when taken together, allocate to the Federal Communications Commission and prohibit to local franchising bodies, the authority to regulate the ownership or control of cable television systems based upon "ownership or control of any media of mass communications or other media interests" and that the defendants acted outside their authority by refusing to approve the requested transfers to Bresnan and Comcast.[12] The defendants argue (1) that the Cable Act does not prohibit them from considering the maintenance of "competition" in the Huntsville market in the decision-making process[13] and (2) that Comcast's anticom-

**12.** The court notes that the FCC authority in this area and the restrictions on local authority are not coextensive. The FCC may regulate only with regard to "other media of mass communication" that "serve the same community" as does the cable system in question. On the other hand, the restriction on local franchising authorities covers "other media interests" as well as "media of mass communications." The statute makes it clear that the term "media of mass communications" includes *inter alia* cable television systems. 47 U.S.C. § 309(i)(3)(C)(i) as incorporated by 47 U.S.C. § 533(g). The term "other media interests" is not defined but textually appears to be more inclusive than is the more restrictive "media of mass communications." Furthermore, the restriction on local

regulation of ownership or control is imposed without regard to whether such "media of mass communications" or "other media interests" are in the same area as the cable system being regulated.

**13.** In their brief, at page 4, the defendants assert that § 533(d) does not prohibit them from considering competition because that section was aimed only at "preclud[ing] municipalities from excluding *newspapers or television broadcasters* from the cable television business." (emphasis supplied) Textually, the Cable Act does not support the limited reading accorded it by the defendants. Section 533(g) provides that "For purposes of this section, the term 'media of mass communications' shall have the meaning

petitive conduct formed an independent basis upon which they were authorized to reject the second transfer request.

■■■ When called upon to consider the meaning of any statute, the court must first examine its text. Almost one hundred years ago, Justice Holmes said, "[W]e ask ... what those words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used." Holmes, *The Theory of Legal Interpretation*, 12 Harv.L.Rev. 417 (1899). If the text of a statute leaves no room for doubt as to its meaning, the court has no authority to go further. The United States Supreme Court has recently said,

> When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances. *Burlington Northern R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987); *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *TVA v. Hill*, 437 U.S. 153, 187, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978). We do not believe that this is one of those rare cases where the application of the statute as written will produce a result "demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

*Demarest v. Manspeaker*, — U.S. —, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991). If there appears a plain, good reason to apply the ordinary meaning of the words as written, the court must apply that ordinary meaning. *See, e.g., West Virginia University Hosp., Inc. v. Casey*, 499 U.S. —, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. —, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241,

109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 470, 109 S.Ct. 2558, 2574, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). "In the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'" *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). "Where the language of a statute is not ambiguous and does not lead to absurd results, the job of the courts is to apply it as written." *Arline v. School Bd. of Nassau County*, 772 F.2d 759, 762 (11th Cir.1985), *aff'd*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

■■■ Applying those principles, the court concludes that § 533(c) and (d) say, and mean, simply that the FCC is authorized to regulate the ownership and control of local cable television systems by persons on the basis of ownership or control of other local cable television systems and that local franchising authorities, such as the City of Huntsville, may not prohibit the ownership or control of a local cable television system because of ownership or control of any other cable television system. This is so whether the City couches its decisions in terms of maintaining a "competitive" cable television market or otherwise.

In enacting the Cable Act, the Congress intended to establish a "national policy" for the regulation of cable television systems. 47 U.S.C. § 521(1). It intended to "encourage the growth and development of cable systems," 47 U.S.C. § 521(2), and to "promote competition in cable communications and minimize unnecessary regulation," 47

---

given such term under section 309(i)(3)(C)(i) of this title." Section 309(i)(3)(C)(i) provides:
 The term "media of mass communications" includes television, radio, cable television, multipoint distribution service, direct broadcast satellite service, and other services, the licensed facilities of which may be substan-

tially devoted toward providing programming or other information services within the editorial control of the licensee.
Clearly, then, the prohibition of § 533(d) includes much more than "newspapers or television broadcasters" and specifically includes cable television systems.

U.S.C. § 521(6). While the court is hesitant to write into law unenacted legislative history, the reports of the legislative committees that considered the Cable Act prior to its passage are helpful in discerning what the Congress sought to accomplish when it passed the Cable Act. The Committee on Energy and Commerce of the United States House of Representatives said,

> The Committee has determined a need for national standards which clarify the authority of Federal, state and local government to regulate cable through the franchise process. These standards and procedures are the heart of [the Cable Act].... [I]f that franchise process is to further the purposes of this legislation, the provisions of these franchises, and the authority of the municipal governments to enforce these provisions, must be based on certain important uniform Federal standards that are not continually altered by Federal, state or local regulation.[14]

The Senate Committee on Commerce, Science, and Transportation said that, in an effort to encourage fair competition and maximum cable television offerings, "marketplace forces, rather than Government regulations, should prevail." [15] The Senate committee sought to restore the traditional balance between federal and local concerns that would "give local governments the authority over areas of local concern ... to protect local needs." [16]

Both the House and Senate committees made clear their intent that local franchising authorities not be permitted to restrict ownership or control of cable television systems because of ownership or control of other cable systems. The Senate committee said:

> [Section 533(d)] [p]rovides that no State or local entity shall have the authority to prohibit the ownership of cable systems by any person by reason of that person's ownership of any other media

interests. Those media interests include broadcast (radio or television), cable, newspaper, programming service, or other printed or electronic information service. The intent of the committee is to prevent any State or local cross-ownership or multiple ownership restrictions. The committee believes in free and open competition in the marketplace and in the elimination of and prevention of artificial barriers to entry by any such person.[17]

The House committee was more direct. It said:

> Section 613(d) [47 U.S.C. § 533(d)] preempts state and local governments, and franchising authorities, from prescribing rules with respect to the ownership of cable systems and media of mass communications or other media interests.[18]

▮ Rather than being unclear or equivocal, the intent of Congress and the language of the statute are straightforward and undeniable. The Congress has allocated to a federal agency, the FCC, the authority to regulate ownership and control of local cable television systems where the ownership and control of other local mass communications media are at issue. Conversely, it has denied to local governments the authority to regulate ownership or control of cable systems where ownership or control of any other media of mass communications are a concern. Clearly, then, the City may not, consistent with § 533(d), prohibit either Bresnan or Comcast from acquiring Cable Alabama because they own or control other cable television systems, either in the City of Huntsville or elsewhere.

▮ In a footnote, the defendants suggest that the Cable Act provides no private cause of action by which the plaintiff may enforce the provisions of § 533(c) and (d). Cable Alabama relies on *Centel Cable Tele-*

---

**14.** H.R.Rep. No. 934, 98th Cong., 2d Sess. 23–24, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4660–61.

**15.** S.Rep. No. 67, 98th Cong., 1st Sess. 5 (1983).

**16.** S.Rep. No. 67, 98th Cong., 1st Sess. 11 (1983).

**17.** S.Rep. No. 67, 98th Cong., 1st Sess. 20 (1983).

**18.** H.R.Rep. No. 934, 98th Cong., 2d Sess. 58, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4695.

*vision Co. v. Admiral's Cove Assoc., Ltd.,* 835 F.2d 1359 (11th Cir.1988) for authority to bring this action. In *Centel Cable TV* the Eleventh Circuit held that a private cause of action may be maintained to enforce the provisions of 47 U.S.C. § 541(a)(2). That section requires that local cable television franchise agreements be construed to allow cable systems access to "public rights-of-way, and ... easements, ... which have been dedicated for compatible uses." Defendants argue that the *Centel* court did not "broadly" find a private cause of action throughout the Cable Act.

While it is true that the *Centel* court was concerned specifically with an action brought to enforce § 541(a)(2), it did, in fact, "broadly" discuss private causes of action under the Cable Act. Much of what was said there with regard to § 541(a)(2) could be said with equal force about § 533(c) and (d). The court is convinced: (1) § 533(c) and (d) were enacted to protect cable television systems against arbitrary restraints on ownership and control by local franchising bodies; (2) a private cause of action to enforce § 533(c) and (d) is consistent with Congress' stated goal of minimizing unnecessary regulation that would impose unwarranted economic burdens on cable systems; (3) a private cause of action is consistent with the Cable Act's distribution of regulatory functions between federal and state authorities inasmuch as there is no other forum to which the plaintiff can turn for review of the City's decisions to reject the Bresnan and Comcast transfer requests; and (4) the Congress intended that local cable systems have access to a federal forum in order to enforce federal rights as set out in the Cable Act. *See generally Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

■ Having found that Cable Alabama has a private cause of action to enforce its rights under the Cable Act, the court must now decide whether the City contravened the provisions of 47 U.S.C. § 533(d) when it disapproved the transfer of Cable Alabama, first to Bresnan and then to Comcast, because its officials were determined to maintain a "competitive" cable television market in Huntsville. The court finds that the City acted in violation of § 533(c) and (d).

The record of the defendants' responses and actions with respect to Cable Alabama's requests for approval of transfers to Bresnan and Comcast demonstrates beyond any arguable doubt that the preservation of competition, as defined by the defendants, was a primary, if not the only, basis for the defendants' refusals to approve the transfers. Mayor Hettinger's report concerning the Comcast transfer focused on the transfer's impact "on competition ... presently ... [and] in the future." (Jackson Declaration, Exhibit H, p. 2) Councilman Wall said that he could see no reason to make him believe the council should permit competition in the cable television industry in the City to end. (Jackson Declaration, Exhibit B, p. 20–21) Councilman Putnam refused to countenance the "reestablish[ment of] a monopoly operation." (Jackson Declaration, Exhibit B, p. 25) The defendants virtually admit in brief that they were motivated in their decisions to reject the transfer requests only by their desire to maintain two separate cable television systems in Huntsville, Alabama.

But Comcast has absolutely no intention of operating a *second* cable television system pursuant to the Franchise Agreement. Comcast and C[able] A[labama] have made clear that their plan is for Comcast to *shut down* one of the two systems, and operate only the remaining system. *It is that, and only that, termination of C[able] A[labama]'s obligation to serve the public which requires the City's approval, and to which the City has not agreed.* (Brief of Defendants, p. 6) (underlining in original) (italics added)

The defendants justify their refusal to approve Cable Alabama's transfer to either Bresnan or Comcast by pointing out that the purpose and effect of these two transfer proposals would be the elimination of one of the cable television systems.

The defendants assert that they did not spurn the requests to transfer the rights, privileges and obligations of Cable Ala-

bama to Bresnan and Comcast because of Comcast's ownership and Bresnan's planned ownership of the Comcast cable system; they claim they did so only because both Bresnan and Comcast, once they owned both systems, planned to cease operation of the Comcast system and thereafter to operate a single cable television system in Huntsville. The defendants have consistently defined "competition" in terms of having two separate and independent cable television systems.[19] In order to maintain the present head-to-head competition in the cable television market, the defendants cannot permit one person to own and control both Huntsville cable systems.[20] The defendants could not maintain their version of competition, in the context of the Bresnan and Comcast transfer requests, without taking into account their ownership of the Comcast system. Therefore, when the City says to Bresnan and to Comcast, "If you own or control the Comcast system, you may not also own or control the Cable Alabama system because you plan to close the Comcast system," it is doing precisely what § 533(c) says the FCC can do and what § 533(d) says the City cannot do.

■ The defendants argue that they based their decision to reject the Cable Alabama request to transfer its franchise to Comcast on the fear that Comcast would abuse its market power once it gained a monopoly position in the Huntsville cable television market, a basis entirely independent of any concern about preserving competition in the market.[21] Referring to Cable Alabama's antitrust action against Comcast, the defendants argue that Comcast " 'wrongfully sought to eliminate competition in the Huntsville cable television

market' by predatory pricing and other anti-competitive practices." (Brief of Defendants, p. 23) (quoting the City Council's committee to negotiate terms for the proposed transfer to Comcast) The defendants also run afoul of § 533(d) with this argument. They do not argue that Comcast is ineligible, because of character defects, to own and control *any* cable system in Huntsville, Alabama. They say only that Comcast, because of its alleged predatory pricing tactics, is ineligible to own and control its own system *and* Cable Alabama's system. In others words, the defendants say that Comcast may own and control one cable system but may not own and control two cable systems in the City. The City refuses to permit Comcast to own and control the Cable Alabama system because it already owns and controls another cable system. This is what § 533(d) prohibits.

In any event, it is clear that the alleged "anti-competitive" conduct of Comcast was more an excuse than a reason for the decision to reject the transfer request. There was no such excuse available when the City was faced with the Bresnan transfer request; that request was clearly rejected because the council was determined to maintain two competing cable systems. Even the defendants' counsel admitted, "[T]he City would likely oppose the transfer of C[able] A[labama]'s franchise obligations to *anyone* whose plan was to shut the [Cable Alabama] system down." (Brief of Defendants, p. 7) (emphasis in original)

Furthermore, the City's conduct with regard to Comcast since 1986 belies the present claim that Comcast is disqualified by reason of its bad character from owning

---

**19.** This cramped view of "competition" ignores the fact that cable television systems are in fact in "competition" with other forms and means of disseminating news, information and entertainment, i.e., motion pictures, video cassette recorders, newspapers, magazines, broadcast television and radio stations, professional and amateur athletic events, direct broadcast satellite systems, and wireless cable systems.

**20.** The defendants have been able to prevent the owner of one system from acquiring the other system only because the agreement with Cable

Alabama gives them the right to disapprove any transfers of the Cable Alabama system. They have no such right with regard to the Comcast system.

**21.** Brief of Defendants, p. 22. Apparently, this "independent basis" argument is limited to the decision to reject the Comcast application. There is no argument, and the record provides scant support for any argument, attacking Bresnan's suitability for ownership of the Huntsville cable systems on character or financial grounds.

the Cable Alabama system. Evidently, that concern came about only after the City received Cable Alabama's request to approve the transfer to Comcast. The City's attorney was advised as early as November 18, 1986 that the Group W cable franchises, the franchises purchased by Comcast, would likely expire February 11, 1989. (Second Jackson Declaration, Exhibit X) Even though the Comcast franchises may have expired more than two years before this lawsuit was filed, the City has seemingly done nothing to test the authority of Comcast to continue to operate a cable system in that City or to prevent it from doing so.[22] It would seem, if the defendants' professed concern about Comcast's pricing practices was genuine, they could have used the questionable status of the Comcast franchises in an effort to counter those practices.

In January 1988 Cable Alabama had informed the Huntsville City Attorney of Comcast's pricing practices and had asked the City to enact legislation that would have allowed it to compete with Comcast on a more even-handed basis.[23] The City ignored this request for aid. On April 11, 1990, the day after the City rejected the Bresnan transfer request, Cable Alabama once again asked for help. Mr. William Jackson, Cable Alabama's president, wrote:

> To improve the business survivability in the current environment we are requesting the City of Huntsville to use its police powers to pass ordinances or modify existing ordinances to assure that this market does not have discriminatory practices in the pricing and availability of cable programming, and that a set of standards are established, such as mini-

mum pricing rules, that will assure all cable operators that there is some protection from anti-competitive practices while doing business in Huntsville. (Jackson Declaration, Exhibit N)

The City once again failed to provide any help.

Finally, the City's own investigation of Comcast operations in other cities, where there were no competing cable systems, revealed no significant complaints either about service or pricing. (Jackson Declaration, Exhibits U and V) The survey showed that, when compared to other cable television providers, Comcast tended to carry similar numbers of channels and provide similar services at comparable prices.

To summarize, the court finds, with regard to the Cable Act claims, that: (1) section 533(c) allocates to the Federal Communications Commission the authority to regulate ownership and control of local cable television systems based upon ownership or control of other local cable television systems; (2) section 533(d) prohibits local franchising authorities from regulating the ownership or control of local cable television systems based upon ownership or control of any other cable television system; (3) the Cable Act authorizes a private cause of action by the operator of a cable television system who has been aggrieved by the refusal of a local franchising authority to permit it to sell or otherwise transfer its system to another cable television provider because the proposed transferee owned or controlled another cable television system in violation of § 533(c) and (d); (4) the City of Huntsville, its mayor and city council have violated § 533(d) by basing their decisions to reject Cable Ala-

---

**22.** Under 47 U.S.C. § 541(b) no cable operator may provide cable service without a franchise unless that operator was providing such service on July 1, 1984 without a franchise and, even then, the local franchising authority may require such a franchise.

**23.** The proposed local ordinance was fashioned after certain provisions of the federal anti-trust laws and various state consumer protection laws. The court does not suggest that the proposed ordinance, if enacted, would have effectively accomplished the ends sought by Cable Alabama or that it would not have run afoul of

the Constitutions of the United States or the State of Alabama or various provisions of federal and state law. For example, Comcast, or some other party, might well have challenged the ordinance on the basis of the Cable Act's specific prohibition on regulation of cable television rates except in certain specified circumstances. *See* 47 U.S.C. § 543. The important point to note here is that the defendants made no discernible effort to alleviate the problem in the Huntsville cable television market before it reached this critical stage. (Jackson Declaration, Exhibit W)

bama's requests to transfer its cable system to Bresnan and to Comcast for the stated reason that Bresnan and Comcast would then own and control both Huntsville cable television systems; and (5) the alleged Comcast character defect was not the reason for which the transfer to Comcast was rejected. The plaintiff's motion for summary judgment will be granted on Claim One.

### C. The First Amendment Right to Refrain From Speaking.

 The plaintiff asserts that, by forcing it to continue to provide cable television services in the City of Huntsville, Alabama, pursuant to the enacted franchise agreement, the defendants have violated its First Amendment right to refrain from speaking.[24] "Cable television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.'" *Leathers v. Medlock*, 499 U.S. ——, ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494, 502 (1991) (citing *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986)). The precise parameters of the First Amendment as applied to operators of cable television systems have not been fully explored, but, at the very least, "a cable operator has a protected first amendment interest in its 'original programming [and its] editorial discretion over which stations or programs to include in its repertoire.'" *Warner Cable Communications, Inc. v. City of Niceville*, 911 F.2d 634, 637 (11th Cir.1990) (quoting *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. at 494, 106 S.Ct. at 2037). The First Amendment is made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Douglas v. Jeannette*, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, *reh'g denied*, 319 U.S. 782, 63 S.Ct. 1170, 87 L.Ed. 1726 (1943); *Brooks v. Auburn University*, 412 F.2d 1171 (5th Cir.1969). Thus, if the defendants have unconstitutionally infringed the plaintiff's right under the First Amendment to refrain from speaking, they may be liable in damages or otherwise.

In *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the United States Supreme Court considered "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." 430 U.S. at 713, 97 S.Ct. at 1434–35.[25] In holding that the state could not impose such a requirement, the Court said, "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." 430 U.S. at 714, 97 S.Ct. at 1435 (citing *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 633–34, 645, 63 S.Ct. 1178, 1183, 1188–89, 87 L.Ed. 1628 (1943)). Before considering the facts of the case before it, the Court briefly reviewed its own decisional history concerning governmental efforts to compel speech. See, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (a government may not, consistent with the First Amendment, compel newspapers to provide space for political candidates to reply to published criticisms); *West Virginia State Bd. of Education v. Barnette*,

---

24. The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

25. *Wooley* concerned followers of the Jehovah's Witnesses faith who objected on religious grounds to displaying New Hampshire license plates bearing the state motto "Live Free or Die." One of the objectors had stated, "I refuse to be coerced by the State into advertising a slogan which I find morally, ethically, religiously and politically abhorrent." 430 U.S. at 713, 97 S.Ct. at 1434.

319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (a state may not impose a requirement of speech on "matters of opinion and political attitude" by requiring public school students to salute the American flag and recite the pledge of allegiance). Chief Justice Burger then applied the test of *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968) [26] to the facts in *Wooley* and found that the proffered state interests in requiring the display of the state slogan on automobile license plates were advanced by means not sufficiently narrow in scope and were not ideologically neutral.

A number of the lower federal courts have considered claims involving First Amendment rights of cable television operators. All have agreed that such rights are available, but have often differed on the standard to be applied when claims of governmental interference with those rights are at issue. In struggling with First Amendment issues as applied to cable operators, the lower federal courts have, predictably, not always reached consistent results. *See, e.g., Chicago Cable Communications v. Chicago Cable Comm'n,* 879 F.2d 1540 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990); *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396 (9th Cir.1985); *Quincy Cable Television, Inc. v. FCC,* 768 F.2d 1434 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986); *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119 (7th Cir.1982); *Midwest Video Corp. v. FCC,* 571 F.2d 1025 (8th Cir.1978), *aff'd,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Home Box Office, Inc. v. FCC,* 567 F.2d 9 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Each medium of expression "must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975).

In assessing broad First Amendment values in connection with new media, courts must be mindful of "differing natures, values, abuses and dangers" associated with different means of expression. *Kovacs v. Cooper,* 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949) (Jackson, J., concurring).

In *Home Box Office, Inc. v. FCC,* 567 F.2d at 44–45, the court applied the *O'Brien* standard to claims involving FCC regulations limiting programming options available to cable operators. The court found that the FCC regulations failed both the first and second parts of the *O'Brien* test because the FCC failed to demonstrate a real need for the regulations and because the regulations were "grossly overbroad" in that they indiscriminately limited the programming options of cable operators without regard to whether they actually served the interests purported to be served. *Home Box Office, Inc. v. FCC,* 567 F.2d at 49–51.

In *Quincy Cable Television, Inc. v. FCC,* 768 F.2d 1434, the D.C. Circuit Court of Appeals considered the First Amendment implications of the FCC's "must carry" rules as they were then applied to local cable television operators. Under those rules local cable systems were required to carry all local and significantly viewed over-the-air broadcast stations in the cable system's operating area. The court first declined to apply the relaxed First Amendment standard applicable to cases involving broadcast stations which was justified primarily by the scarcity of available over-the-air broadcast channels. *See Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1804–05, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States,* 319 U.S. 190, 212–13, 63 S.Ct. 997, 1007–08, 87 L.Ed. 1344 (1943) ("With everybody on the air, nobody could be heard.") The court next considered whether the rules constituted merely an "incidental" burden on

**26.** According to *O'Brien,* a governmental act that incidentally burdens free speech must be within the constitutional power of the government, further an important or substantial governmental interest that is unrelated to the suppression of free expression and must be no more restrictive than is essential to the furtherance of that governmental interest.

speech subject to analysis under *O'Brien* or whether the government must bear the "heavier" burden of justification applicable to cases involving governmental efforts to restrict or otherwise curtail expression. The court said,

> [F]or cable, no less than for other media, the First Amendment draws a distinction between "incidental" burdens on speech—regulations that evince a governmental interest unrelated to the suppression or protection of a particular set of ideas—and restrictions that are "intended to curtail expression—either directly by banning speech because of ... its communicative or persuasive effect on its intended audience ... or indirectly by favoring certain classes of speakers over others...." [*Home Box Office, Inc. v. FCC*] 567 F.2d at 47–48.

> If the regulation falls in the former category, it will be sustained if "it furthers an important or substantial governmental interest ... and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679. *See also Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); *Procunier v. Martinez,* 416 U.S. 396, 411, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974); *National Black United Fund, Inc. v. Devine,* 667 F.2d 173, 179 (D.C.Cir.1981). If, however, the regulation cannot fairly be understood as a merely incidental restriction on expression, the regulation will be upheld, if at all, only if the government adequately carries a significantly heavier burden of justification. Indeed, some governmental objectives—"such as a desire to suppress support for a minority party or an unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas— ... are so plainly illegitimate" that they are forbidden altogether. *Members of City Council of Los Angeles v. Taxpayers for Vincent, supra,* 104 S.Ct. at 2128.

*Quincy Cable Television, Inc. v. F.C.C.,* 768 F.2d at 1450–51 (footnote omitted).

After finding that the "must carry" rules could not withstand scrutiny even under the less demanding *O'Brien* standard, the court did not decide whether the more exacting rule was the appropriate one. The court struck down the "must carry" rules because they "coerce[d] speech; they require[d] the operator to carry the signals of local broadcasters regardless of their content and irrespective of whether the operator consider[ed] them appropriate programming for the community it serves." *Quincy Cable Television, Inc. v. F.C.C.,* 768 F.2d at 1452.

■ The court has determined that the defendants' refusal to approve Cable Alabama's transfer requests to Bresnan and Comcast cannot withstand analysis under the less demanding *O'Brien* test. Accordingly, this court, as did the *Quincy* court, need not determine whether some level of scrutiny higher than that required by *O'Brien* would be more appropriately applied to this claim.[27] As previously noted, under *O'Brien,* a regulation that incidentally burdens free speech may be sustained only if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that governmental interest. *United States v.*

---

**27.** The court notes that in *Wooley,* Chief Justice Burger, after finding that the compelled display of the New Hampshire state slogan, "Live Free or Die," implicated First Amendment concerns because it required the objector to carry a particular message, proceeded to apply the *O'Brien* test to the facts of that case. Chief Justice Burger said,

> We must also determine whether the State's countervailing interest is sufficiently compelling to justify requiring appellees to display the state motto on their license plates. *See, e.g., United States v. O'Brien,* 391 U.S. 367, 376–377, 88 S.Ct. 1673 [1678–1679], 20 L.Ed.2d 672 (1968).

*Wooley v. Maynard,* 430 U.S. at 716, 97 S.Ct. at 1436, 51 L.Ed.2d at 763.

*O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679, 20 L.Ed.2d at 680.

The defendants advance three "governmental interests" which they claim are furthered by their rejection of Cable Alabama's transfer requests.[28] They say that, by rejecting the requests, they are able to preserve competitive, competent, and honest cable television within the City of Huntsville. They are able to: (1) prevent a cable operator from creating a monopoly by selling to a competitor; (2) prevent a transfer of the cable system to an unworthy, corrupt, incompetent, or otherwise, unqualified company; and (3) prevent cable operators from undertaking "other actions with their public trust that could lead to negative consequences for the City." (Brief of Defendants, p. 29) The governmental interests claimed by the defendants do not withstand scrutiny under the standards established by the United States Supreme Court in *O'Brien.* First, the prevention of a monopoly cable television market is nothing more than the defendants' old "competitive" marketplace argument that was rejected earlier in the context of § 533(d) of 47 U.S.C. The City acted without authority when it considered the ownership or control of another cable system in making the decisions to reject Cable Alabama's transfer requests, first to Bresnan and then to Comcast. The Congress has determined that ownership or control of other cable systems is a matter of federal and not local concern. The City simply has no legitimate interest—important, substantial or otherwise—in the maintenance of two separate cable television systems.

Second, even though the City has a legitimate interest in preventing the operation of a cable television system by an economically or morally unqualified entity, the facts here do not support the defendants' claim that Comcast is unqualified under appropriate standards to operate a single system in the City of Huntsville, Alabama. Comcast presently serves the majority of the cable subscribers in the City, operating, perhaps, without a franchise authorizing such service. The defendants have seemingly made no effort to rid themselves of Comcast. Their own investigation revealed that Comcast was probably no better and no worse than the average cable operator in the region surveyed. With regard to the Bresnan transfer request, there has been no serious contention that Bresnan was, in any way, not qualified to serve the cable television needs of the City of Huntsville. Certainly, the proposed sale to Bresnan provided a less onerous means by which the City could have satisfied its interest in having an economically and morally qualified cable television operator.

Finally, the defendants claim that the City has a legitimate and important interest in preventing "actions ... that could lead to negative consequences for the City." This "interest" is so vague as to be meaningless; pursuit of this goal cannot, therefore, be said to further an important or substantial governmental interest. The court simply does not comprehend what the defendants intend to convey by this statement.

In short, the defendants' proffered reasons for rejecting the transfers to Bresnan and Comcast serve no "important or substantial" governmental interest and do not represent the least intrusive means by which legitimate governmental interests may be satisfied; their reasons, therefore, will not withstand the plaintiffs First Amendment challenges. The plaintiff's motion for summary judgment will be granted on this claim.

### D. *The Vagueness Claim.*

■ In its fourth claim, the plaintiff avers that Section 14 of its franchise agree-

---

**28.** After listing the governmental interests which they claim justify their actions, the defendants argue that *Wooley* and other cases concerning the First Amendment right to refrain from speaking are limited to efforts by the government to compel "ideological" speech. The First Amendment is not so limited. *Any* governmental regulation of the right not to speak must comport with the requirements of the United States Constitution. "Although the goal of the ["must carry"] rules—preserving local broadcasting—can be viewed as unrelated to the suppression or protection of any particular set of ideas, the rules nonetheless profoundly affect values that lie near the heart of the First Amendment." *Quincy Cable TV, Inc. v. FCC,* 768 F.2d at 1453.

ment, under which the City purportedly acted to reject both the Bresnan and Comcast transfer requests, is unconstitutionally vague because it "provides no specific standards or criteria for judging any petition for transfer of the franchise or change in control." (Complaint, p. 24) Section 14 of the franchise agreement, which, as noted earlier, was enacted as a Huntsville ordinance, contains two provisions that purport to specify the factors that may be considered in decisions regarding transfer requests. In all cases, the City Council may factor into the decision-making process: (1) the qualifications of the proposed transferee; (2) relevant matters concerning whether the transferee will comply with the terms of the franchise; and (3) "all other relevant matters." (Jackson Declaration, Exhibit E, § 14.3) If the proposed transfer is "to any existing Cable TV Franchise of the City," the council may also consider the impact the proposed transfer "would have upon the availability of a modern state of the art channel transmission capability system [and] ... upon competition." (Jackson Declaration, Exhibit E, § 14.1)

 "Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah,* 333 U.S. 95, 97, 68 S.Ct. 397, 398, 92 L.Ed. 562 (1948). Nevertheless, a statute that clearly proscribes some conduct, but may or may not reach other conduct, may be found valid as to the conduct it clearly prohibits, but void as to the conduct to which it may or may not apply. *E.g., United States v. National Dairy Prod. Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) (decided under the Due Process Clause of the Fourteenth Amendment). However, where a statute implicates First Amendment concerns, it must have clear application in all circumstances or it will be found entirely void. Justice Marshall has clearly stated the rationale behind the "void for vagueness" doctrine.

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227–28 (1972) (footnotes omitted). The Supreme Court, with Justice Marshall again writing for the court, later expanded upon and further clarified the "vagueness" doctrine.

These standards should not ... be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has

also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If ... the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–1194, 71 L.Ed.2d 362, 371–72 (1982) (footnotes omitted).

The defendants counter the vagueness claim by asserting that Section 14, taken in its entirety, does nothing more than regulate economic activity and is, for that reason, subject to a lower standard of review. According to the defendants, the plaintiff can succeed on its vagueness claim only if Section 14 "is impermissibly vague in all of the applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. at 495, 102 S.Ct. at 1191.

The defendants' argument seems to rely upon the fact that Section 14 treats proposed transfers "to any existing Cable TV Franchise[s] of the City" differently than it does proposed transfers to other persons. Where Cable Alabama proposes to transfer its cable system to another person who owns or controls another cable system in the City of Huntsville, the defendants may consider the factors listed in Section 14.1. These include the impact of the proposed transfer on the availability of a modern state of the art cable system and its impact on competition in the market. (Jackson Declaration, Exhibit E, § 14.1) If, on the other hand, the proposed transfer is to a person who does not own another Huntsville cable system, the council is limited to consideration of the factors set out in Section 14.3, which are: (1) the qualifications of the proposed transferee; (2) relevant matters concerning whether that person will comply with the terms of franchise; and (3) "all other relevant matters." (Jackson Declaration, Exhibit E, § 14.3)

Cable Alabama sought permission to transfer its cable system to Bresnan and to Comcast, both of whom either then owned, or would have owned, another cable system in the City of Huntsville, Alabama. In such circumstances, Section 14.1 clearly and unequivocally permits the City to consider the effect of such a transfer on "competition" in the Huntsville cable television market. Thus, the defendants' argument presumably goes, the City was authorized by Section 14.1 to consider "competition" because both Bresnan and Comcast owned or would have owned another cable system in the City and that is one application in which the section is not impermissibly vague. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. at 495, 102 S.Ct. at 1191–1192. Consideration of the entire passage from *Hoffman Estates*, however, demonstrates that the rule relied upon by the defendants is not so sweeping as they suggest. There, the court said,

In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, *assuming the enactment implicates no constitutionally protected conduct*, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. at 494–95, 102 S.Ct. at 1191 (footnote omitted) (emphasis supplied).

■ The court agrees with the defendants that Section 14 is not vague in all its applications, but since First Amendment concerns are present, that section must be voided if it is vague in any application. The court has already found that the trans-

fer approval provisions of the franchise, as set out in Section 14, and applied by the defendants, unconstitutionally burdened Cable Alabama's First Amendment right to refrain from engaging in the cable television business in Huntsville, Alabama. The court must now determine whether Section 14 provides a " 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' " *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497, 501 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981) (quoting *Jordan v. DeGeorge,* 341 U.S. 223, 231–32, 71 S.Ct. 703, 707–708, 95 L.Ed. 886 (1951)). Where First Amendment concerns are implicated, a statute is unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning." *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243, 253 (1976) (quoting *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). Because Cable Alabama's right not to speak under the First Amendment is burdened by application of Section 14, the court's review is a heightened one. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 499, 102 S.Ct. at 1193–94.

The court has concluded that Section 14 allows for an open-ended, unguided and unstructured decision-making process by the defendants. It permits consideration of a proposed transferee's qualifications without any standard to determine what qualifications the transferee must meet. Such qualifications are apparently left to the unfettered discretion of the mayor and councilmen. The section also permits consideration of other "relevant matters." Presumably, "relevant matters" may be anything the defendants wish to consider. Councilman Saunders believed that it was relevant to consider whether the transfer to Comcast would result in a "monopoly" in the Huntsville cable market. (Jackson Declaration, Exhibit R, p. 97) Two other councilmen, Putnam and Wall, insisted that the maintenance of two separate, competing cable systems was permitted under Section 14. Councilman Wall said, "[The] freedom to choose to do business with another company has more economic impact on the American competitive market than any other single factor. *I want that to be preserved for the citizens of Huntsville.*" (Jackson Declaration, Exhibit B, p. 20) (emphasis supplied) Mayor Hettinger stated in his recommendation to the council on December 31, 1990:

> Given Section 14, and the broad discretion of the council, it is clear that the Council may inquire into any matters which may be relevant to the transfer, including but not limited to, the effect the transfer might have on competition, subscriber rates, quality of service and other matters.

(Jackson Declaration, Exhibit Q, p. 4) In summary, "men of common intelligence must necessarily guess" at the meaning of Section 14. *Hynes v. Mayor of Oradell,* 425 U.S. at 620, 96 S.Ct. at 1760. The section is unconstitutionally vague and the plaintiff will be granted summary judgment on its fourth claim.

### E. The "Takings" Claim.

In Count Five of its complaint, the plaintiff claims that, by arbitrarily and unreasonably preventing it from selling its cable system, first to Bresnan and then to Comcast, the defendants "have twice deprived Cable Alabama of its property without just compensation." (Complaint, p. 26) The defendants have moved for summary judgment on this claim on the basis that the facts, as alleged by the plaintiff and as demonstrated by the evidence, show that no "taking" in violation of the Fourteenth Amendment has occurred. *See Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

Defendants' motion for summary judgment on this claim will be denied. "The inquiry into whether a taking has occurred is essentially an 'ad hoc, factual' inquiry.' " *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815, 834 (1984) (citing *Kaiser Aetna v.*

*United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).

> The Court ... has identified several factors that should be taken into account when determining whether a governmental action has gone beyond "regulation" and effects a "taking." Among those factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations."

*Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1005, 104 S.Ct. at 2874 (quoting *Prune-Yard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041–2042, 64 L.Ed.2d 741 (1980)). When governmental action extinguishes a "fundamental attribute of ownership" there has been a taking for purposes of the Fifth and Fourteenth Amendments to the United States Constitution. *Agins v. City of Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). The plaintiff's right to relief on this claims depends primarily upon whether the defendants acted reasonably; this determination, in turn, involves an "ad hoc factual" inquiry most suitable for resolution by a jury.

### F. *The Equal Protection Claim.*

■ The plaintiff's sixth claim is that the defendants have deprived it of the equal protection of the law by arbitrarily imposing upon it a restriction that limits its right to sell its system while not imposing a similar requirement upon Comcast, the plaintiff's competitor. Though it did not explicitly so state in its complaint, the plaintiff now argues that "by harshly enforcing provisions of Cable Alabama's current franchise while allowing Comcast to operate with an expired franchise," the defendants have subjected it to unequal treatment in violation of the Fourteenth Amendment. The defendants argue that, since Cable Alabama is not a "discrete and insular" minority and Section 14 does not burden a fundamental political or civil right, strict scrutiny is not warranted. *See, e.g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Harper v.*

*Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Defendants maintain that only a "conceivable basis" minimum-rationality test is applicable. *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 442–443, 3 L.Ed.2d 480 (1959).

The court, as noted earlier, has already found that the actions of the defendants in their applications of Section 14 significantly burdened the plaintiff's First Amendment right to refrain from speaking. Therefore, in the opinion of the court, the Equal Protection claim requires application of a standard higher than the "conceivable basis" minimum-rationality test urged by the defendants. Unfortunately, the court is unable to give the claim and the defendants' motion directed to it the kind of disciplined, well-considered treatment which the claim and motion require because the parties gave this claim so little attention in their briefs.

Accordingly, the defendants' motion for summary judgment as addressed to the Equal Protection claim will be denied.

### G. *The Alabama Contract Claim.*

■ The defendants have moved for summary judgment as to plaintiff's claim under Alabama law that the defendants unreasonably withheld their permission to transfer the Cable Alabama system first to Bresnan and then to Comcast. According to the plaintiff, under Alabama law, contractual provisions like those contained in Section 14 are evaluated under a commercially reasonableness standard. Cable Alabama argues that it has "demonstrated the commercial reasonableness and practicability of its proposed transfers." (Complaint, p. 28)

The plaintiff relies upon *Homa–Goff Interiors, Inc. v. Cowden,* 350 So.2d 1035 (Ala.1977) to support its position. In *Homa–Goff,* the Alabama Supreme Court refused to apply a long standing Alabama rule which had provided that "when a lease contains an approval clause, the landlord may arbitrarily and capriciously reject pro-

posed subtenants." Id. at 1037. *See Faucett v. Provident Mut. Life Ins. Co. of Philadelphia*, 244 Ala. 308, 13 So.2d 182 (1943); *City Garage & Sales Co. v. Ballenger*, 214 Ala. 516, 108 So. 257 (1926); *Mattox v. Wescott*, 156 Ala. 492, 47 So. 170 (1908); *Crommelin v. Thiess & Co.*, 31 Ala. 412 (1858); *Nave v. Berry*, 22 Ala. 382 (1853). The *Homa–Goff* court held that, even where a lease includes an approval clause, a landlord may not unreasonably and capriciously withhold his consent to a sublease agreement. *Homa–Goff Interiors, Inc. v. Cowden*, 350 So.2d at 1038. The court there, however, was concerned with a particular kind of contract, a lease that conveyed an estate in real property. The plaintiff has not directed the court's attention to any Alabama case in which the court has authoritatively approved, in the context of general contract law, a claim such as that presented here, and the court is not convinced that the Alabama courts would extend the holding of that case to a municipal franchise granted to a cable television operator.

As was the case with regard to the Equal Protection claim, the court is simply unwilling to decide this issue on summary judgment, given the paucity of the parties' assistance. The defendants do not cite the court to a single Alabama case dealing with the subject matter of this claim; they merely argue that they were reasonable in considering "the impact which said transfer would have upon the availability of a modern state of the art channel transmission capability system to subscribers generally within the City of Huntsville as well as the impact such transfer would have upon competition." (Defendants' Brief, p. 43) The defendants' motion for summary judgment will be denied as it is addressed to the Alabama contract claim.

## IV. RELIEF.

The plaintiff has asked the court to declare Section 14 of the franchise agreement void as being in violation of 47 U.S.C. § 533(d), the First Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Takings Clause of the Fifth Amendment; to permanently enjoin the defendants from enforcing or attempting to enforce the provisions of Section 14 to prevent the plaintiff from transferring its cable television system to Comcast; and to prohibit the defendants from taking any other action pursuant to the terms of Section 14. The plaintiff also seeks damages and its costs of bringing this action, including attorneys fees.

It is clear that the defendants may not apply the provisions of Section 14 to prevent any transfer of Cable Alabama's rights, privileges, and obligations that were acquired under the franchise agreement because of the proposed transferee's ownership or control of any other media of mass communication, including any other cable television system. They may not avoid the terms of section 533(d) by claiming that they acted merely to perpetuate "competition" in the Huntsville cable television market. Ordinarily, in these circumstances, the court would merely enjoin and direct the defendants to reconsider their rejection of the Comcast transfer request and to make a new decision, unfettered by any improper consideration, such as Comcast's ownership and control of its own cable television system in the city. Here, however, the defendants have proffered but two grounds to support their decision to disapprove the transfer to Comcast. Each of their reasons has been found wanting as a legal basis for their actions. The defendants have been afforded a full, fair and complete opportunity to offer a lawful justification for the position they have taken and they have not done so. Under these circumstances, the defendants are not entitled to a second opportunity to find a lawful ground to support the rejection of the transfer.

If the court were faced only with the Cable Act claims, it would merely order the defendants forthwith to give their consent to the requested Comcast transfer. The court must, however, also consider relief under the free speech and vagueness claims. As was the case with regard to the Cable Act claims, the defendants have been afforded a fair opportunity to advance im-

portant or substantial governmental interests to justify the burden placed upon the plaintiff's First Amendment right to terminate its operation of a cable television system in Huntsville. They have not suggested any sufficient reason. Thus, there is no occasion to give them a second opportunity to consider the First Amendment concerns implicated by their rejection of the Comcast transfer request.

Upon a finding that Section 14 is unconstitutionally vague and that it burdens free speech, it is not enough for the court to simply order the defendants to reverse their decision to reject the Comcast transfer request. The defendants, by their application of Section 14, have required the plaintiff to continue in the cable television business in Huntsville, Alabama against its will. Where, as here, a statute implicates First Amendment concerns, it must have clear application in all circumstances or it will be found entirely void. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972). Section 14 of the franchise agreement is unconstitutionally vague and has been used by the defendants to infringe upon the plaintiff's First Amendment right to quit the cable television business. It cannot stand. Accordingly, by separate order, the court will declare Section 14 of the franchise agreement void and of no effect whatsoever. That being the case, the defendants will have no legally enforceable interest in the transfer of Cable Alabama's franchise rights, privileges, and obligations to Comcast and the plaintiff will, by order of the court, be authorized to execute the agreement to transfer its cable television system in Huntsville, Alabama to Comcast. The defendants will be permanently enjoined from enforcing or attempting to enforce the provisions of Section 14 to prevent the plaintiff, its successors or assigns from transferring Cable Alabama's rights, privileges, and obligations to Comcast or any other cable television operator.

There remain issues pending in this action that can be resolved only after a full trial, i.e., the demand for damages on Claims One, Three and Four and all issues in Claims Two, Five, Six and Seven. Trial of those issues will be set separately. The court will reserve for later decision the demand for plaintiff's attorneys fees.

An appropriate order and injunction in conformity with this opinion will be entered.

## ORDER AND PERMANENT INJUNCTION

In accord with the Memorandum of Opinion entered contemporaneously herewith, it is hereby ORDERED, ADJUDGED and DECREED:

1. Section 14 of the Cable Television Franchise Agreement entered into between the City of Huntsville, Alabama and Cable Alabama Corporation on or about March 11, 1986, which was subsequently enacted as an ordinance of the City of Huntsville, Alabama, is DECLARED null, void and of no effect whatsoever.

2. The plaintiff, Cable Alabama Corporation, is hereby authorized to execute and complete the terms of the settlement agreement entered into between Cable Alabama Corporation and Comcast in full and complete settlement of all the issues in *Cable Alabama Corporation v. Comcast Corporation and Comcast Cablevision of Huntsville, Inc.*, CV–90–H–0941–NE, which provided for the transfer of Cable Alabama's rights, privileges, and obligations under its cable television franchise in Huntsville, Alabama to Comcast Cablevision of Huntsville, Inc.

3. The defendants, the City of Huntsville, Alabama, Jim Putnam, Jimmy Wall, Bill Kling, Jr., Richard Showers, Sr., and Chuck Saunders, in their official capacities as members of the Huntsville City Council, and Steve Hettinger and their agents, servants, employees, representatives, attorneys and all persons acting on their behalf or in active concert or participation with any of them, who receive actual notice of this order are, subject to further orders of this court or the United States Court of Appeals for the Eleventh Circuit, hereby PERMANENTLY RESTRAINED and ENJOINED from enforcing or attempting to enforce the provisions of Section 14 of the

Cable Television Franchise Agreement entered into between the City of Huntsville, Alabama and Cable Alabama Corporation on or about March 11, 1986, which was subsequently enacted as an ordinance of the City of Huntsville, Alabama, to prevent, restrain or inhibit the plaintiff, its successors or assigns from transferring Cable Alabama's rights, privileges, and obligations to Comcast or any other cable television provider based upon the provisions of the said Section 14.

4. Trial of the demands for damages on Claims One, Three and Four and of all issues on Claims Two, Five, Six and Seven is hereby set at 9:00 o'clock a.m. on Monday, October 7, 1991 in Courtroom 7B, at the Hugo L. Black United States Courthouse, 1729 Fifth Avenue North, Birmingham, Alabama.